# Exhibit B

# FRIEDMAN SCHUMAN

Attorneys at Law • A Professional Corporation

Brett J. Kaminsky
Direct Dial: (215) 690-3821
Bkaminsky@fsalaw.com

www.fsalaw.com

Main Office
275 Commerce Drive
Suite 210
Fort Washington, PA 19034
Phone: (215) 635-7200
Fax: (215) 635-7212

May 27, 2025

***Via Hand Delivery & E-mail***
Ms. Lauren Harrington, Esq.
**Senior Vice President & General Counsel-Aramark**
1101 Market Street
Philadelphia, PA 19107

Mr. Carl Mittleman
**Chief Operating Officer, International-Aramark**
2400 Market St.
Philadelphia, PA 19103

> Re:    **Stacy Graff Baehmann, as Administrator of the Estate of Zachary Graff,
> dec'd v. Aramark Corporation, et al.
> Philadelphia CCP, April Term, 2025, No. 01450**

Dear Ms. Harrington and Mr. Mittleman:

As you are aware, this firm represents the family of Zachary Graff, who passed away on May 8, 2023, after spending approximately 15 hours unconscious and disregarded in a hallway at Gulou Hospital in Nanjing, China—a facility where security and cleaning services were provided by Aramark Service Industries (China) Co., Ltd., a subsidiary of U.S. based Aramark.

Despite our efforts to engage your company, we have received no response or acknowledgement to the following:

1.     A demand letter sent on December 2, 2024;

2.     A Writ of Summons filed in the Philadelphia Court of Common Pleas on April 11, 2025 and served on all Aramark defendants on April 15, 2025 at Aramark's headquarters;

3.     Pre-complaint discovery requests sent via certified mail on May 1, 2025.

FRIEDMAN SCHUMAN

Attorneys at Law • A Professional Corporation

Page 2

## I.    Factual Background

Zachary Graff, a 37-year-old U.S. citizen and husband, visited Gulou Hospital on May 7, 2023, to obtain medication for chronic pain.  After filling his prescriptions, he used the medication and, feeling unwell, sat down in a hallway chair on the hospital's fourth floor, an area which Aramark personnel were responsible for patrolling.  He remained there, unconscious, in plain sight, for 15 hours until his wife, after desperate and repeated efforts to locate him (efforts which were disturbingly impeded by Aramark personnel), finally found him in the same chair—*barely alive*. He was transported to the emergency department, where resuscitation efforts failed.  He was pronounced dead at 2:28 a.m. on May 8, 2023.

Hospital CCTV footage confirms that Aramark's security and cleaning staff repeatedly observed Zachary in distress, walked past him, tried to wake him, and even tried to speak with him—yet failed to report his condition or obtain medical attention.  Aramark personnel failed to take any affirmative action to assist, help, or seek assistance, failing to even report Zachary's condition for hours.  Most egregiously, Aramark personnel *locked Zachary in that area and allowed him to remain seated there unconscious*—after failing to conduct even a cursory walk-through—thereby preventing anyone from finding or helping him in time.

When Zachary's wife, Xiaoni, arrived at the hospital that evening in search of him, Aramark security *refused* her access to the locked area, dismissing her concerns despite her pleas and police confirmation of his last known location and lied to her, telling her they cleared the area. Only after she returned with police and was required to sift through CCTV in a desperate search for her husband, did Aramark security finally permit her access to the area—revealing her husband in the same position that he had been sitting in for 15 hours, but it was too late.

## II.    Liability and Admissions of Aramark Representatives

Aramark's gross systemic failures in policy, staffing, training, and oversight, which is documented in its own annual reports, directly led to this preventable tragedy.  Aramark knowingly employs undertrained and unqualified entry-level workers across the globe and despite recognizing this structural vulnerability, has failed to implement safeguards to prevent the kind of institutional negligence that led to the death of Zachary Graff.   Aramark's SEC filings also implicitly acknowledge that workforce training and conduct are business risks.  For example, the filings cite **"the inability to hire and retain… qualified personnel"** as an operational risk, which is well known to Aramark.   Additionally, Aramark notes, at times when the United States or other geographic regions experience reduced levels of unemployment or a general scarcity of labor like we have seen in recent periods, **"there may be a shortage of qualified workers at all levels"**. An Aramark representative who was sent to meet with Zachary Graff's family, confirmed in a recorded audio statement all of these issues, including the problems with training and lack of staffing. Had Aramark implemented and enforced global policies regarding appropriate hiring and training of personnel, Zachary would still be here today.



FRIEDMAN SCHUMAN

Attorneys at Law • A Professional Corporation

Page 3

## III.    Final Request for Contact

These facts and admissions raise serious concerns about Aramark's oversight, training, and operational practices. Aramark's own statements suggest clear awareness of the systemic failures that contributed to Zachary Graff's death. We intend to hold Aramark directly responsible.

If we do not hear from your office **within 14 days** of receipt of this letter, we will file the attached Complaint and pursue all legal and public avenues available.

We look forward to your prompt response.

Very truly yours,

Brett J. Kaminsky
Katherine Lekh

BJK
Enclosure

cc:    Aramark's Office of General Counsel (*via regular delivery*)
Steve Mallozzi, Esquire (*via regular delivery*)

**Fort Washington, PA • Philadelphia, PA • Cherry Hill, NJ**

**FRIEDMAN SCHUMAN LAYSER, P.C.**
Brett J. Kaminsky (ID. No. 318369)
bkaminsky@fsalaw.com
Katherine Lekh (ID. No. 329272)
klekh@fsalaw.com
275 Commerce Drive, Suite 210
Fort Washington, PA 19034
215-635-7200                                    *Attorneys for Plaintiff*

| | |
|---|---|
| **STACY GRAFF BAEHMANN, as Administrator of the Estate of ZACHARY GRAFF, dec'd** | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| *Plaintiff,* | APRIL TERM, 2025 |
| vs. | **NO.: 01450** |
| **ARAMARK CORPORATION, ARAMARK, ARAMARK MANAGEMENT SERVICES LP, ARAMARK SMMS LLC, ARAMARK ENTERPRISES, ARAMARK FACILITY SERVICES, ARAMARK FACILITY SERVICES, INC., ARAMARK FHC, LLC, ARAMARK GLOBAL GROUP, LLC, ARAMARK HEALTHCARE SUPPORT SERVICES INC., ARAMARK HOLDINGS CORPORATION, ARAMARK GLOBAL, and ARAMARK SERVICE INDUSTRIES CHINA CO., LTD** | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

## NOTICE TO DEFEND

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered

### AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede

against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP:**

**PHILADELPHIA BAR ASSOCIATION**
**Lawyer Referral and Information Service**
**One Reading Center**
**Philadelphia, PA  19107**
**(215) 238-1701**

continuar la demanda en contra suya sin previo aviso o notificacion.  Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.  Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

**LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE.  SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO.   VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL:**
**ASOCIACION DE LICENCIADOS DE FILADELFIA**

**Servicio De Referencia**
**Informacion Legal**
**One Reading Center, Filadelfia,**
**Pennsylvania  19107**
**(215) 238-1701**

**FRIEDMAN SCHUMAN LAYSER, P.C.**
Brett J. Kaminsky (ID. No. 318369)
bkaminsky@fsalaw.com
Katherine Lekh (ID. No. 329272)
klekh@fsalaw.com
275 Commerce Drive, Suite 210
Fort Washington, PA 19034
215-635-7200                                  *Attorneys for Plaintiff*

| | |
|---|---|
| **STACY GRAFF BAEHMANN, as Administrator of the Estate of ZACHARY GRAFF, dec'd** <br><br> *Plaintiff,* <br><br> vs. <br><br> **ARAMARK CORPORATION, ARAMARK, ARAMARK MANAGEMENT SERVICES LP, ARAMARK SMMS LLC, ARAMARK ENTERPRISES, ARAMARK FACILITY SERVICES, ARAMARK FACILITY SERVICES, INC., ARAMARK FHC, LLC, ARAMARK GLOBAL GROUP, LLC, ARAMARK HEALTHCARE SUPPORT SERVICES INC., ARAMARK HOLDINGS CORPORATION, ARAMARK GLOBAL, and ARAMARK SERVICE INDUSTRIES CHINA CO., LTD** <br><br> *Defendants.* | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** <br><br> APRIL TERM, 2025 <br><br> **NO.: 01450** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

## <u>COMPLAINT</u>

Plaintiff, Stacy Graff Baehmann, as Administrator of the Estate of Zachary Graff, deceased, by and through her undersigned counsel, Friedman Schuman Layser, P.C., brings this action against the above-named defendants (collectively, "Defendants") and demands damages, including punitive damages, in a sum in excess of the local arbitration limits, exclusive of pre-judgment interest, post-judgment interest and costs, upon the causes of action set forth below.

## I.    INTRODUCTION

This matter involves the tragic and preventable death of Zachary Graff, a thirty-seven (37) year old husband, son, and brother, who passed away on May 8, 2023, after spending approximately fifteen (15) hours unconscious and unattended in a facility where security and cleaning services were provided by Aramark Service Industries (China) Co., Ltd., a subsidiary of Aramark U.S. (defined below).  Zachary Graff's death highlights the egregious lack of oversight, training, policies and procedures by Aramark U.S. and its subsidiaries, leading to this terrible and unnecessary outcome.

***

Aramark U.S. is a publicly traded, Philadelphia-based corporation and a global leader in food services, facilities management, and uniform services.  With more than two hundred and fifty thousand (250,000) employees worldwide, Aramark U.S. purportedly operates in twenty-two (22) countries across North America, Europe, Asia, and South America, serving clients in education, healthcare, business, industry, sports, leisure, and corrections sectors by and through several wholly owned subsidiaries.  These entities operate under the direct oversight and control of Aramark U.S.'s corporate leadership, headquartered in Philadelphia, ensuring adherence to the company's global standards and practices. These China-based subsidiaries are subject to the same reporting lines and operational directives as other international branches, with executive-level oversight maintained from Aramark's global headquarters. Regular audits, compliance reviews, and performance metrics are reportedly monitored directly by Aramark U.S. leadership to ensure conformity with its global standards.

2

In its annual reports to shareholders and filings with the U.S. Securities and Exchange Commission (SEC), Aramark U.S. routinely underscores its commitment to health and safety, stating that the company "strives to maintain the highest standards in training, service quality, and compliance." Aramark U.S. reports that its reputation and profitability are directly tied to its ability to maintain safety protocols, provide competent staffing, and deliver "consistent service levels" across its global operations.

Notably, Aramark U.S. and its subsidiaries have conducted business in China for over a decade, with services aimed at major hospitals, international schools, universities, and large corporations. It has previously announced strategic expansion efforts in Asia and highlighted China as a key growth market in investor calls and international business press releases.

Aramark U.S.'s operations in China have included partnerships with public and private institutions to provide hospitality, food, sanitation, and support services. These operations are often executed through locally registered subsidiaries or joint ventures which are owned by Aramark U.S. and which Aramark U.S. oversees, manages, or controls through contractual obligations and operational standards.

Aramark U.S. publicly and routinely claims that it implements uniform global standards across all its regions, including China, using proprietary training programs, auditing mechanisms, and performance reviews to ensure alignment with its corporate safety and staffing expectations. The following highlights its abject failures to do so, which cost Zachary Graff his life.

3

## II.    PARTIES AND JURISDICTIONAL FACTS

1.    Plaintiff, Stacy Graff Baehmann, as Administrator of the Estate of Zachary Graff, deceased (hereafter, "Plaintiff"), is an adult individual, citizen, and resident of the State of Missouri, residing at 5912 Oakville Woods Place, St. Louis, MO 63129.

2.    Plaintiff is the surviving parent of Zachary Graff and serves as Administrator of the Estate of Zachary Graff (hereafter, "Estate"), Letters of Administration having been granted on March 5, 2025, by the Circuit Court of St. Louis County, State of Missouri – Probate Division. A true and correct copy of the Letters of Administration is attached hereto as **Exhibit "A".**

3.    Plaintiff's decedent, Zachary Graff (hereafter, "Decedent" or "Zachary"), was born on January 30, 1986, and died on May 8, 2023. A true and correct copy of the Report of Death of a U.S. Citizen Abroad is attached hereto as **Exhibit "B".**

4.    At the time of his untimely death, Zachary was just thirty-seven (37) years old.

5.    Zachary was a United States citizen, temporarily residing in China with his wife, Xiaoni Xu (hereafter, "Xiaoni").

6.    Plaintiff brings this action on behalf of all of the beneficiaries of Decedent's Estate under and by virtue of Pennsylvania's Wrongful Death Act, 42 Pa. C.S.A. § 8301, and Survival Act, 42 Pa. C.S.A. § 8302 and the applicable Rules of Civil Procedure and decisional law.

7.    Notice of the institution of this action, as required by Pa. R.C.P. 2205, was given to the following individuals:

| **Zachary's surviving spouse:** | **Zachary's mother:** |
|---|---|
| Xiaoni Xu | Stacy Graff Baehmann |
| RM 1000, Bldg 28 | 5912 Oakville Woods Place |
| Baijiahu West Garden Nanjing, China | St. Louis, MO 63129 |

8.      Defendant, Aramark Corporation (hereafter, "Aramark Corporation"), is a Delaware business corporation or other legal entity, registered to do business within the Commonwealth of Pennsylvania, that regularly conducts business at its principal place of business located at 2400 Market Street, Philadelphia, PA 19103.

9.      Defendant, Aramark (hereafter, "ARMK"), is a Delaware corporation or other legal entity, registered to do business within the Commonwealth of Pennsylvania, that regularly conducts business at its principal place of business located at 2400 Market Street, Philadelphia, PA 19103.

10.     Defendant, Aramark Management Services LP (hereafter, "Aramark Management"), is a Pennsylvania limited partnership or other legal entity, that regularly conducts business at its principal place of business located at 2400 Market Street, Philadelphia, PA 19103.

11.     Defendant, Aramark SMMS LLC (hereafter, "Aramark SMMS"), is a Delaware limited liability company or other legal entity, that regularly conducts business at its principal place of business located at 2400 Market Street, Philadelphia, PA 19103.

12.     Defendant, Aramark Enterprises (hereafter, "Aramark Enterprises"), is a foreign business corporation or other legal entity, and/or unregistered fictitious name for the various Aramark Defendant entities (defined below), that regularly conducts business at its headquarters located at 2400 Market Street, Philadelphia, PA 19103.

13.     Defendant, Aramark Facility Services (hereafter, "AFS"), is a fictitious name for Aramark Management Services, a Pennsylvania limited partnership or other legal entity, that regularly conducts business at its principal place of business located at 2400 Market Street, Philadelphia, PA 19103.

3

14.     Defendant, Aramark Facility Services, Inc. (hereafter, "AFS, Inc."), is a Maryland business corporation or other legal entity, registered to do business within the Commonwealth of Pennsylvania, that regularly conducts business at its principal place of business located at 2400 Market Street, Philadelphia, PA 19103.

15.     Defendant, Aramark FHC, LLC (hereafter, "Aramark FHC"), is a Delaware limited liability company or other legal entity, registered to do business within the Commonwealth of Pennsylvania, that regularly conducts business at its principal place of business located at 2400 Market Street, Philadelphia, PA 19103.

16.     Defendant, Aramark Global Group, LLC (hereafter, "Aramark Global Group"), is a Luxembourg limited liability company or other legal entity, registered to do business within the Commonwealth of Pennsylvania, that regularly conducts business at its principal place of business located at 2400 Market Street, Philadelphia, PA 19103.

17.     Defendant, Aramark Healthcare Support Services Inc. (hereafter, "Aramark Healthcare"), is a Delaware business corporation, liability company or other legal entity, registered to do business within the Commonwealth of Pennsylvania, that regularly conducts business at its principal place of business located at 2400 Market Street, Philadelphia, PA 19103.

18.     Defendant, Aramark Holdings Corporation (hereafter, "Aramark Holdings"), is a Delaware business corporation or other legal entity, registered to do business within the Commonwealth of Pennsylvania, that regularly conducts business at its principal place of business located at 2400 Market Street, Philadelphia, PA 19103.

19.     Defendant, Aramark Global (hereafter, "Aramark Global"), is an unregistered fictitious name for the various Aramark Defendant entities (defined below), that regularly conducts business at its principal place of business located at 2400 Market Street, Philadelphia, PA 19103.

4

20.     Defendant, Aramark Service Industries China Co., Ltd. (hereafter, "Aramark China"), is a foreign business corporation or other legal entity, that regularly conducts business at its headquarters located at 2400 Market Street, Philadelphia, PA 19103.

21.     "Aramark Corporation", "ARMK", "Aramark Management", "Aramark SMMS", "Aramark Enterprises", "AFS", "AFS, Inc.", "Aramark Global Group", "Aramark Healthcare", "Aramark Holdings", "Aramark Global", and "Aramark China", may collectively be referred to as "Aramark Defendants" or "Aramark".

22.     "Aramark Corporation" and "ARMK", may collectively be referred to as "Aramark" or "Aramark U.S.".

23.     Aramark U.S. is a United States based, multi-billion-dollar global corporation that with its global headquarters located in Philadelphia, Pennsylvania.[1]  *See* Pa. R.C.P. 2179.

24.     "Aramark Management", "Aramark SMMS", "Aramark Enterprises", "AFS", "AFS, Inc.", "Aramark Global Group", "Aramark Healthcare", "Aramark Holdings", "Aramark Global", and "Aramark China", may collectively be referred to as "Aramark Subsidiaries".

25.     Upon information and belief, the Aramark Subsidiaries are wholly owned subsidiaries of Aramark U.S., which Aramark U.S. owns, operates, and controls.[2]

26.     At all relevant times hereto, Aramark U.S., through the Aramark Subsidiaries, in particular, Aramark China, was contracted to provide services to Gulou Hospital ("Gulou Hospital" or "Hospital") located in Nanjing City, Jiangsu, China.[3]

---

[1] Aramark Announces Site of New Global Headquarters in Philadelphia, ARAMARK (Sept. 11, 2026), https://www.aramark.com/newsroom/news/2016/new-global-headquarters.

[2] Aramark U.S. works in tandem with the Aramark Subsidiaries, utilizing its vast corporate resources to develop programs at the enterprise level in furtherance of achieving its goals. *See* https://www.aramark.com/about-us/enterprise-solutions.

[3] Gulou Hospital is a state-owned, tertiary hospital that consists of various multi-specialty clinics.

5

27.     Aramark U.S. is responsible for the actions of its actual, apparent and/or ostensible agents, servants and employees.

28.     At all relevant times hereto, Aramark U.S. owed a duty of care, protection, security and candor to the business invitees of Gulou Hospital, including Decedent.

29.     At all relevant times hereto, Aramark U.S. engaged as its actual, apparent and/or ostensible agents, servants and employees, various staff personnel, including but not limited to, security guards, cleaning personnel and other staff, who at all times were: (1) engaged for the provision of services at Gulou Hospital, and were obligated to use the skill, knowledge and care possessed by a reasonable person in performing their duties; and (2) acting within the course and scope of Aramark U.S.'s agency and/or employment with Aramark U.S. and under its right of control, and purportedly possessed skill and training for the purpose of providing proper services to Gulou Hospital and its business invitees, including Decedent.

30.     Aramark U.S. is liable for the grossly negligent acts or omissions of its actual, apparent and/or ostensible agents, servants and employees under theories of *respondeat superior*, master-servant, agency, ostensible agency and right of control, whose identities include those security guards, cleaning personnel and other staff who observed Decedent at Gulou Hospital on May 7-8, 2023, whose names are not known or knowable to Plaintiff after reasonable investigation and are known only to Aramark Defendants, and will require additional discovery from Aramark Defendants.

31.     At all relevant times hereto, the Aramark Subsidiaries, were acting as actual, apparent and/or ostensible agents, servants and employees of Aramark U.S.

32.     The Aramark Subsidiaries are responsible for the actions of their actual, apparent and/or ostensible agents, servants and employees.

6

33.    At all relevant times hereto, the Aramark Subsidiaries, owed a duty of care, protection, security and candor to the business invitees of Gulou Hospital, including Decedent.

34.    At all relevant times hereto, the Aramark Subsidiaries, engaged as their actual, apparent and/or ostensible agents, servants and employees, various staff personnel, including but not limited to, security guards, cleaning personnel and other staff, who at all times were: (1) engaged for the provision of services at Gulou Hospital, and were obligated to use the skill, knowledge and care possessed by a reasonable person in performing their duties; and (2) acting within the course and scope of the Aramark Subsidiaries' agency and/or employment with the Aramark Subsidiaries and under their right of control, and purportedly possessed skill and training for the purpose of providing proper services to Gulou Hospital and its business invitees, including Decedent.

35.    The Aramark Subsidiaries are liable for the grossly negligent acts or omissions of its actual, apparent and/or ostensible agents, servants and employees under theories of *respondeat superior*, master-servant, agency, ostensible agency and right of control, whose identities include those security guards, cleaning personnel and other staff who observed Decedent at Gulou Hospital on May 7-8, 2023, whose names are not known or knowable to Plaintiff after reasonable investigation and are known only to Aramark Defendants, and will require additional discovery from Aramark Defendants.

36.    At all relevant times hereto, Aramark Defendants undertook and/or assumed a duty to provide services to Gulou Hospital and its business invitees, including Decedent.

37.    Aramark Defendants grossly failed to fulfill this duty.

38.    Punitive damages are sought against all Defendants.

39.    The gross negligence and flagrant conduct of Aramark Defendants, each of them, jointly and severally, as described herein, proximately caused Decedent's death.

40.    The amount in controversy exceeds the prevailing, local arbitration limits.

41.    Venue for this action is properly laid in Philadelphia County, Pennsylvania under the applicable rules of civil procedure and decisional law.  *See* Pa. R.C.P. 1006(a)(1) and (c).

## III.    OPERATIVE FACTS

42.    The previous paragraphs are incorporated by reference as though fully set forth herein.

43.    Zachary Graff was born on January 30, 1986.

44.    Over the course of his lifetime, Zachary tutored students around the world.

45.    After graduating from Webster University with a Bachelor's degree in biology, Zachary moved to Nairobi, Kenya, where he helped build a center for orphaned children.

46.    After that, he moved to South Korea to teach high school students.

47.    After South Korea, he moved to Massachusetts, where he completed his Master's Degree in mental health science at Boston University.

48.    In 2018, Zachary moved to China to teach children, where he met his future wife, Xiaoni.

49.    The two got married in March of 2023.

50.    Shortly after getting married, Xiaoni and Zachary were planning on starting a family.

51.    During his time in China, Zachary was studying for the MCAT (Medical College Admission Test) in hopes of attending medical school.

52.    Zachary's prior medical history includes chronic knee pain.

8

53.     On May 7, 2023, around 9:18 a.m., Zachary arrived at Gulou Hospital to fill prescriptions for his chronic knee pain.[4]

54.     At around 9:56 a.m., Zachary saw a doctor at the pain management clinic.

55.     At around 10:23 a.m., Zachary picked up his medications from the pharmacy and ingested them shortly thereafter.

56.     At around 10:51 a.m., he was seen on his way to visit another clinic within the Hospital, Zachary appears to be weaving.

57.     At around 10:56 a.m., Zachary was seen having difficulty walking and staggering.

58.     At around 10:57 a.m., Zachary sat down in a chair on the fourth floor of the Hospital next to the escalator.

59.     Over the next fifteen (15) + hours, CCTV footage reveals the following:

a.      11:06 a.m. – Zachary's head is tilted back and he is breathing abnormally;

b.      **11:41 a.m. – A member of the Aramark cleaning staff stops in front of Zachary, points at his phone charger under his chair, and walks away;**

c.      12:10 p.m. – A person walking by stops, kicks Zachary's shoe, and walks away after getting no response from Zachary;

d.      12:22 p.m. – A person walks by and points at Zachary;

e.      12:29 p.m. – Zachary appears to have slowed breathing;

f.      12:31 p.m. – Another person walks by and points at Zachary;

g.      **12:36 p.m. – An Aramark security guard comes down the escalator in front of Zachary and continues without stopping;**

h.      **12:49 p.m. – A second Aramark security guard comes down the elevator in front of Zachary and continues without stopping;**

_____

[4] The timeline of events as described herein is based on CCTV footage that is not in Plaintiff's possession. Zachary's family was able to view the CCTV footage in person and take notes but were not permitted to record it.

i.     **12:54 p.m. – Another Aramark security guard walks up to Zachary, looks at him, picks up his charger and puts it in his backpack and then leaves;**

j.     2:00 p.m. – Zachary's head begins to twitch;

k.     **2:27 p.m. – A member of the Aramark cleaning staff passes Zachary five (5) times while polishing the floor around him, even hitting his foot before moving on;**

l.     **2:30 p.m. – An Aramark security guard goes up the escalator in front of Zachary and continues without stopping;**

m.     **2:31 p.m. – Another member of the Aramark cleaning staff walks by Zachary;**

n.     2:40 p.m. – Zachary's head continues to twitch;

o.     **2:42 p.m. – Three (3) Aramark employees walk by Zachary, look at him, and continue walking;**

p.     2:50 p.m. – The lights on the floor go out and the floor appears to be closed;

q.     **3:25 p.m. – An Aramark security guard approaches Zachary and tells Zachary not to sleep anymore but walks away when Zachary does not respond;**

r.     **3:26 p.m. – The same Aramark security guard returns, walks up to Zachary and again tells Zachary to wake up but leaves when Zachary does not respond (during this encounter, the footage shows Zachary's head is twitching and his agonal breathing is audible);**

s.     **3:27 p.m. – The same Aramark security guard returns again, and tries to speak to Zachary a final time and then leaves (Zachary's head is still twitching and his agonal breathing remains audible);**

t.     4:45 p.m. – Zachary's head continues to twitch;

u.     5:30 p.m. – A person walks by and stares at Zachary;

v.     8:30 p.m. – Zachary's head stops twitching;

w.     **8:45 p.m. – An Aramark employee walks right by Zachary with a mop and bucket in hand but does not stop;**

x.     9:14 p.m. – Zachary's head falls to his side.

10

60.     When Zachary did not return home that day, Xiaoni went to the police.

61.     Using facial recognition software and GPS data, the police informed Xiaoni that Zachary's last known location was Gulou Hospital.

62.     Xiaoni further confirmed this by checking Zachary's last ride on their shared ride-sharing app, DiDi.

63.     Xiaoni arrived at the Hospital around 11:15 p.m. and searched everywhere she could for Zachary.

64.     When she tried to enter the locked area of the hospital, Aramark security guards refused to allow her in to search.

65.     Xiaoni explained to the Aramark security guards that according to the police, Zachary's last known location was the Hospital and she had searched everywhere else.

66.     Despite her pleas, the Aramark security guards refused to let her enter the Hospital, insisting that Zachary could not be inside the locked area because it had been cleared and locked by Aramark security guards already.

67.     Xiaoni even suggested that perhaps Zachary had fainted in the restroom and had not been found, and the Aramark security guards told her no; not once, but twice.

68.     Xiaoni had no choice but to leave to call the police.

69.     Even at this point, the Aramark security guards did not conduct a search of the locked area within the Hospital despite learning that someone may be inside.

70.     Xiaoni was forced to seek the assistance of the police.

71.     When Xiaoni returned with police, the Aramark security guards further delayed her efforts to locate Zachary by first requiring her to watch the Hospital's CCTV footage.

11

72.    After reviewing the footage for two (2)- to three (3) hours, Xiaoni located Zachary on the fourth floor, in the area locked by Aramark security guards hours before.

73.    At around 2:15 a.m. (now May 8, 2023), Xiaoni rushed back to the locked area of the hospital and informed the Aramark security guards where Zachary was.

74.    Only then, was Xiaoni permitted inside the locked area to search the fourth floor, where she found Zachary sitting in the dark, in the same chair as fifteen (15) hours earlier.

75.    Zachary was unconscious and barely alive.

76.    Only after Xiaoni began pleading with the Aramark security guards, did they call for medical assistance.

77.    Xiaoni was directed to move Zachary to a wheelchair and Aramark security guards stood by as Zachary's legs collapsed beneath him and they both fell to the floor, Xiaoni pinned underneath Zachary.

78.    At 2:28 a.m., the medical team arrived with a gurney and transported Zachary to the emergency department where Zachary remained unconscious and was noted to have dilated pupils and absent light reflex.

79.    Resuscitation attempts were unsuccessful, and Zachary was pronounced dead at 2:48 a.m. on May 8, 2023, almost eighteen (18) hours after arriving at Gulou Hospital.

80.    During the fifteen (15) hours that Zachary was sitting in the same chair on the fourth floor, CCTV footage shows numerous Aramark personnel observe, attempt to interact with, and ignore Zachary.

81.    Despite clear signs that Zachary was in need of immediate medical attention, Aramark personnel did not alert anyone at the Hospital of Zachary's condition.

12

82.     Instead, Aramark personnel simply watched Zachary deteriorate without intervening or reporting his need for medical attention, and then locked him in and turned off the lights.

83.     While Aramark personnel job responsibilities include conducting a walk-through of areas in the Hospital that are no longer open to public access before turning off the lights, closing and locking the doors, it was later confirmed that Aramark personnel recklessly failed to do so, despite insisting otherwise to Xiaoni.

84.     The CCTV footage demonstrates that not only was something visibly wrong with Zachary such that numerous members of the public observed him in distress, but that there were multiple opportunities for Aramark personnel to report his condition to the appropriate parties.

85.     With a single call to a supervisor, emergency responder or medical provider walking by, Zachary could have received medical treatment and lived.

86.     Had Aramark personnel diligently performed their job duties, specifically in conducting a walk-through of the area, Zachary could have received medical treatment and lived.

87.     Had Aramark personnel allowed Xiaoni to search the fourth floor when she arrived at the Hospital around 11:15 p.m., Zachary could have received medical treatment and lived.

88.     Had Aramark personnel searched the fourth floor themselves after Xiaoni informed them that she believed Zachary was inside, Zachary could have received medical treatment and lived.

89.     Had Aramark personnel exercised even slight care or diligence, Zachary could have received medical treatment and lived.

90.     As a result of their clear and unconscionable neglect, Zachary was deprived of much needed medical intervention resulting in his death.

13

91. Moreover, and due to a clear lack of training, Aramark personnel "cleared the floor" and locked the doors without actually patrolling and clearing the area first, and subsequently denying Xiaoni's entry compromised and eliminated Zachary's chances of being saved.

92. The egregious conduct of Aramark personnel demonstrates a willful and wanton disregard for human life.

93. If Aramark personnel been had properly trained on responding to persons in distress, they would have known to report Zachary's condition rather than turn a blind eye to him.

94. But this blind eye attitude of Aramark personnel reflects a global trend of institutional negligence throughout Aramark U.S. and its subsidiaries.

95. The neglect of Aramark's personnel stems from Aramark U.S.'s deficient global policies and procedures and failure to properly manage and oversee the training, training materials, hiring and staffing of its subsidiaries, Aramark China, in particular.

96. Aramark U.S. was aware of the deficient hiring, staffing and training of security guards and cleaning personnel in its subsidiaries, including Aramark China, yet failed to address these problems.

97. In fact, Aramark U.S.'s annual reports filed with the SEC from 2022 and 2023 note that its workforce requires a large number of entry level workers and a difficulty in finding sufficient employees can compromise Aramark's ability to provide quality service.

98. The failure of Aramark U.S. to rectify these known global corporate issues in addition to the negligence and inaction of Aramark personnel at Gulou Hospital prevented Zachary from receiving medical treatment, directly and proximately causing his death.

99. The emotional, physical, and mental toll caused by Aramark's egregious failures cannot be overstated.

14

**FIRST CAUSE OF ACTION**
**Plaintiff v. All Defendants**

100.    The previous paragraphs are incorporated by reference as though fully set forth herein.

101.    As a result of the negligence, gross negligence, corporate negligence/systemic failures of Aramark Defendants, Decedent suffered devastating injuries leading to his death, including but not limited to the following:

a.    Overdose;

b.    Inability to breathe;

c.    Respiratory failure;

d.    Cardiac arrest;

e.    Anoxic brain injury;

f.    Severe neurologic injury;

g.    Paralysis and/or weakness;

h.    Fear for his safety, recovery and well-being;

i.    Severe emotional distress;

j.    Pain and suffering;

k.    Mental anguish;

l.    Embarrassment;

m.    Humiliation;

n.    Helplessness;

o.    Future loss of potential earning capacity;

p.    Future loss of life's pleasures;

15

  q.  Inability to engage in the usual household, family and social activities;

  r.  Such other injuries and conditions documented in Decedent's medical records; and

  s.  Death.

  102. Aramark Defendants' failures and negligence, as set forth in this Complaint, increased the risk of harm to Decedent and caused him to suffer harm.

  **WHEREFORE,** Plaintiff demands judgment in her favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

## COUNT I – NEGLIGENCE, GROSS NEGLIGENCE, CORPORATE NEGLIGENCE/ SYSTEMIC FAILURE (VICARIOUS LIABILITY/APPARENT AGENCY)
### Plaintiff v. All Defendants

  103. The previous paragraphs are incorporated by reference as though fully set forth herein.

  104. This case does not arise out of isolated negligence but is the result of gross system-wide breakdowns, conscious policy failures, and institutional neglect, which show egregious, reckless, and/or willful and wanton blindness on behalf of Aramark.

  105. Aramark Defendants are responsible for the grossly negligent and careless treatment by their agents, servants, workmen, and/or employees under the theory of *respondeat superior*, agency, right of control and/or apparent authority.

  106. The general, gross and corporate negligence/systemic failure of Aramark Defendants, by and through its actual, apparent and/or ostensible agents, officers, directors and

16

subsidiaries including, but not limited to, Aramark China, consisted of one or more of the following acts or omissions:

a.   Failure to recognize that Decedent was in distress and in need of immediate medical attention;

b.   Failure to recognize that Decedent's unresponsiveness and failure to move from the same chair and same position for fifteen (15) hours was not because he was sleeping;

c.   Failure to properly, timely and adequately respond to Decedent who was in distress;

d.   Failure to recognize that a person who is unresponsive, twitching, seizing, displaying agonal breathing, and whose head is titled back is in need of immediate medical attention;

e.   Failure to recognize that a person who is unconscious may not be able to express discomfort or request help;

f.   Failure to recognize that a person may be in need of immediate medical attention even if they are not bleeding;

g.   Failure to advise supervisors, contact emergency responders or medical staff of Decedent's condition;

h.   Failure to adequately patrol areas of the Hospital in control of Aramark personnel;

i.   Failure to adequately "clear" areas of the Hospital in control of Aramark personnel;

j.   Failure to ensure that nobody remained in an area of the Hospital before turning off the lights and locking the doors;

k.   Failure to adequately clear the area of the Hospital before turning off the lights and locking the doors;

l.   Failure to adequately monitor areas of the Hospital even if they are no longer open to the public;

m.   Falsely claiming that a locked area of the Hospital had been cleared when it had not;

n.   Preventing a search of a locked area of the Hospital to find a missing person last seen at the Hospital;

17

o.    Negligently delaying a search of a locked area of the Hospital to find a missing person last seen at the Hospital;

p.    Failure to check the locked area of the Hospital after being informed that someone may be inside;

q.    Preventing a person from obtaining or receiving medical care;

r.    Negligently delaying a person from obtaining or receiving medical care;

s.    Failure to perform job duties in a manner that a reasonably prudent person would;

t.    Failure to escalate the situation to properly trained personnel after recognizing abnormal or unresponsive behavior;

u.    Failure to perform a physical wellness check as opposed to making assumptions from a distance;

v.    Failure to adequately hire and retain personnel with the appropriate skill-level, knowledge and/or education to recognize, report, and/or respond to a person in distress and/or in need of medical attention;

w.    Failure to remedy knowingly deficient staffing issues;

x.    Failure to provide appropriate funding to its subsidiaries to ensure adequate training, hiring, retention and oversight of personnel, so as to maintain a higher profit margin despite the known risk posed to the public;

y.    Creating or fostering a product which allowed indifference or complacency toward individuals in distress;

z.    Failure to train and educate personnel to recognize, report, and/or respond to a person in distress and/or in need of medical attention;

aa.    Failure to train and educate personnel on notifying other personnel or supervisors of anything abnormal or suspicious;

bb.    Failure to adequately supervise and oversee personnel;

cc.    Failure to provide oversight by supervisory personnel adequately trained to recognize, report, and/or respond to a person in distress and/or in need of medical attention;

dd.    Failure to remedy knowingly deficient training and/or training materials;

18

ee.    Failure to formulate, adopt, implement and/or enforce adequate policies and procedures to instruct personnel on recognizing, reporting and responding to a person in distress and/or in need of medical attention;

ff.    Failure to formulate, adopt, implement and/or enforce policies and procedures to instruct personnel on how to properly clear an area before locking it;

gg.    Failure to maintain adequate oversight and communication with its subsidiaries to ensure adequate and qualified personnel were hired and trained;

hh.    Failure to formulate, adopt, implement and/or enforce policies and procedures regarding notifying other personnel or supervisors of anything abnormal or suspicious;

ii.    Failure to enforce adequate safety precautions to persons under their protection;

jj.    Failure to enforce sufficient polices, to ensure the safety and well-being of persons within their protection;

kk.    Failure to remedy knowingly deficient policies and procedures;

ll.    Recklessly disregarding Zachary to his peril;

mm.    Willfully ignoring red flags, such as abnormal behavior over the course of *hours* where prompt response could have meant the difference between life and death; and

nn.    Failure to prevent the tragic and unnecessary death of Zachary.

107.    The conduct of Aramark Defendants, individually and collectively, constitutes gross negligence, recklessness, and/or a willful and wanton disregard for the safety and well-being of Decedent.

108.    The gross negligence of Aramark Defendants increased the risk of harm to Decedent and was a substantial factor in causing his death.

109.    Aramark Defendants' acts and omissions far exceed mere inadvertence or error; they reflect a systemic disregard for institutional standards, including but not limited to, failures

19

in policy and procedures, lack of oversight and supervision, and inadequate training, hiring and staffing.

110.    Aramark Defendants were aware, or should have been aware, of the foreseeable and substantial risk of injury under these circumstances, particularly for a subsidiary with known staffing issues.

111.    As a direct and proximate result of the negligent and grossly negligent acts and omissions of Aramark Defendants, as described herein, Decedent suffered the damages outlined above.

**WHEREFORE,** Plaintiff demands judgment in her favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

## COUNT II – NEGLIGENT HIRING, TRAINING & SUPERVISION
### Plaintiff v. All Defendants

112.    The previous paragraphs are incorporated by reference as though fully set forth herein.

113.    This case is the further result of Aramark Defendants' willful and reckless practice of negligent hiring, training and supervision of their agents, servants, workmen, and/or employees.

114.    Aramark Defendants were aware that their workforce requires a large number of entry level workers and a difficulty in finding sufficient employees can compromise Aramark's ability to provide quality service.

115.    Aramark Defendants owed a duty to exercise reasonable care in screening, interviewing, and selecting individuals qualified and competent to work in a hospital environment, particularly in roles requiring awareness of patient and visitor safety.

116.    Aramark Defendants were further aware of the deficient hiring, staffing and training of personnel in its subsidiaries yet failed to address these problems.

117.    Aramark China, in particular, has admitted to hiring individuals with minimal skills and lower education.

118.    The failure to adequately train and supervise Aramark personnel, as described herein, led to their failure to detect that Zachary was in distress and failure to properly clear the area before locking the doors.

119.    These failures created a situation in which it was reasonably foreseeable that a person may be harmed.

120.    In this case, these failures created a situation in which Zachary was not only deprived of much needed medical attention but prevented from obtaining it or being found.

121.    Aramark Defendants had a duty to adequately hire, train and supervise its custodial and security employees, ensuring that they adhered to reasonable standards of conduct and responded appropriately to health and safety emergencies on hospital grounds.

122.    Aramark Defendants breached this duty by failing to:

    a.    Monitor the conduct of its employees;

    b.    Provide real-time oversight or escalation procedures;

    c.    Intervene or correct behavior that reflected indifference to an individual in medical crisis; and

    d.    Knowingly allow said conduct to continue despite the known dangers posed to the general public.

21

123.    Over a period of more than fifteen (15) hours, numerous Aramark employees came into direct contact with Zachary while he was visibly incapacitated, twitching, and audibly gasping for breath.

124.    Despite these unmistakable signs, no Aramark employee escalated the situation, contacted medical personnel, or took basic steps to determine his condition or seek assistance.

125.    This collective and sustained inaction reflects a fundamental breakdown in supervisory protocols and enforcement of employee responsibilities.

**WHEREFORE,** Plaintiff demands judgment in her favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

## COUNT III – NEGLIGENT RETENTION
### Plaintiff v. All Defendants

126.    The previous paragraphs are incorporated by reference as though fully set forth herein.

127.    As evidenced in prior filing with the SEC, Aramark Defendants knew (or should have known), either through internal complaints, performance evaluations, incident reports, or supervisory observation, that its employees were incapable of performing their responsibilities safely and responsibly.

128.    Despite this knowledge, Aramark Defendants knowingly retained employees who lacked adequate judgment, training and awareness necessary for employment in a medical setting.

22

129.    By failing to terminate or reassign such employees, or otherwise failing to ensure proper hiring and retention of adequately qualified employees, Aramark Defendants knowingly created a foreseeable risk of harm to patients, visitors, and staff.

130.    The negligent retention of unfit employees directly contributed to the prolonged neglect and lack of intervention during Zachary's medical emergency.

131.    As a direct and proximate result, Zachary suffered preventable injuries and death.

**WHEREFORE**, Plaintiff demands judgment in her favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

## COUNT IV – WRONGFUL DEATH ACT
### Plaintiff v. All Defendants

132.    The previous paragraphs are incorporated by reference as though fully set forth herein.

133.    Plaintiff brings this Wrongful Death Action on behalf of the Estate of Zachary Graff under and by virtue of the Wrongful Death Act, 42 Pa. C.S.A. § 8301 and the applicable Rules of Civil Procedure and decisional law.

134.    Under the Wrongful Death Act, Decedent left surviving as his sole heirs-at-law, his wife, Xiaoni Xu and mother, Stacy Graff Baehmann.

135.    As a result of the negligent acts and omissions of Aramark Defendants, as described more fully herein, Decedent suffered catastrophic and fatal injuries and death, resulting in the entitlement to damages by the aforementioned beneficiaries under the Wrongful Death Act.

23

136.    Plaintiff claims the full measure of damages recoverable under and by virtue of the Wrongful Death Act, applicable Rules of Civil Procedure and decisional law.

137.    Plaintiff claims damages for the pecuniary losses suffered by reason of the death of Decedent, including but not limited to, damages for all medical expenses, funeral and burial expenses and the costs of estate administration necessitated by reason of the negligence and injuries which caused Decedent's death.

138.    Plaintiff claims damages for loss of earnings, maintenance, support, comfort, care, society, guidance, tutelage and/or other losses recognized under the Wrongful Death Act, which the Wrongful Death beneficiaries would have received from Decedent had his death not occurred.

139.    Plaintiff claims damages for the monetary support that Decedent could have been expected to provide to the Wrongful Death beneficiaries during his lifetime had his death not occurred.

140.    Plaintiff claims damages for the pecuniary value of services which Decedent could have been expected to provide to the Wrongful Death beneficiaries during his lifetime had his death not occurred.

**WHEREFORE,** Plaintiff demands judgment in her favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

24

## COUNT V – SURVIVAL ACT
### Plaintiff v. All Defendants

141.    The previous paragraphs are incorporated by reference as though fully set forth herein.

142.    Plaintiff brings this Survival Action on behalf of the Estate of Zachary Graff under and by virtue of the Survival Act, 42 Pa. C.S.A. § 8302 and the applicable Rules of Civil Procedure and decisional law.

143.    As a result of the negligent acts and omissions of Aramark Defendants, as described more fully herein, Decedent suffered catastrophic and fatal injuries and death, resulting in the entitlement to damages by Decedent's Estate, under the aforementioned Survival Act.

144.    Plaintiff brings this action to recover on behalf of Decedent's Estate to recover the full measure of damages recoverable under and by virtue of the Survival Act, applicable Rules of Civil Procedure and decisional law.

145.    On behalf of Decedent's Estate, Plaintiff claims damages for all economic losses to the Estate, including but not limited to, Decedent's total estimated future earning capacity, less his personal maintenance costs.

146.    On behalf of Decedent's Estate, Plaintiff claims damages for Decedent's physical discomfort, pain and suffering, loss of enjoyment of life's pleasures and all other damages and losses recoverable under and by virtue of the Survival Act, applicable Rules of Civil Procedure and decisional law.

**WHEREFORE,** Plaintiff demands judgment in her favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional

25

requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court

deems just and proper.

**FRIEDMAN SCHUMAN LAYSER, P.C.**

Date:  5/27/2025                    By: _____

Brett J. Kaminsky, Esquire
Katherine Lekh, Esquire
*Attorneys for Plaintiff*

26